**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:16-cr-20-GZS |
| CAREY ACKIES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS**

Before the Court are six Motions to Suppress brought by Defendant Carey Ackies (ECF Nos. 107-109, 116-118), which are described more fully below. The Court held an evidentiary hearing on ECF Nos. 108, 116, and 118, and gave the parties the opportunity to present oral argument on the other Motions, on June 29 and 30, 2017. The Court has considered the evidence provided at the hearing, including the testimony of Thomas Pappas, Diette Ridgeway, Schamia Taylor, and the Defendant, as well as the Government's Post-Hearing Memorandum (ECF No. 142) and Defendant's Response (ECF No. 145). For the reasons explained below, the Court DENIES five of Defendant's Motions.[1]

## I. FACTUAL FINDINGS

The following facts are drawn from the record in this case, including the relevant search warrants and search warrant applications, and the exhibits and testimony presented at the hearing on Defendant's Motions.

---

[1] As noted at the suppression hearing, the Court is reserving ruling on Defendant's Motion to Suppress Testimony Regarding Out-Of-Court and In-Court Identifications (ECF No. 117) and will rule if and when the Government calls the identification witnesses at trial. Neither side objected to this approach.

In the fall of 2015, a cooperating defendant ("CD1") told DEA investigators that he[2] could purchase a substantial amount of heroin and cocaine base from an unidentified dealer known as "Boyd," a black male from New York; that CD1 had indeed previously purchased substantial quantities of heroin from Boyd on multiple prior occasions; that Boyd had "runners" who would transport drugs from New York to CD1 in Maine; and that CD1 owed Boyd a substantial amount of money for drugs that Boyd had previously "fronted" to CD1. CD1 has previously provided information and cooperation in unrelated drug trafficking investigations that had led to the seizure of drugs and multiple arrests and convictions.

In early 2016, investigators received information from a separate cooperating defendant that CD1 was presently involved in the distribution of heroin. On January 14, 2016, investigators met with CD1 for the purpose of obtaining additional information about Boyd and recovered approximately three grams of suspected heroin and more than $17,000 in cash. CD1 was not arrested in order to further the investigation of Boyd.[3]

CD1 told investigators that he had traveled to New York shortly before Christmas and met with Boyd at a motel in or around Jamaica, Queens. CD1 provided (347) 331-8138 ("Target Telephone 1," or "TT1") as a contact number for Boyd.[4]   DEA Task Force Officer ("TFO")

---

[2] For simplicity's sake, the Court will refer to the cooperating defendants in this case by masculine pronouns.

[3] The warrant application disclosed that CD1 has a significant criminal history, including multiple felony drug trafficking convictions and frequent violations of court-imposed conditions of release or supervision. At the time of the warrant affidavit, CD1 had pending felony state drug trafficking charges and had been informed that federal charges were forthcoming. CD1 was represented by counsel and cooperating in the hopes of receiving prosecutorial and judicial consideration at sentencing. In addition, CD1 was cooperating pursuant to an agreement whereby he was provided direct use, but not derivative use, immunity.

[4] CD1 also provided a second number for Boyd. On a phone in CD1's possession, DEA Task Force Officer ("TFO") Thomas Pappas observed calls and text message exchanges with this second number, including a text providing the address of the motel where CD1 met Boyd. There was also a text message received from that number providing the name and telephone number of a man who CD1 met in New York and identified as being involved in drug activity.

Thomas Pappas[5] inspected one of CD1's cellular phones and observed text message exchanges between CD1 and TT1, which CD1 explained involved arranging a trip to visit Boyd in New York to set up future drug transactions.[6]  When TFO Pappas inquired about Boyd's requests that CD1 call him on "another" or "new" phone, CD1 stated that Boyd is fearful that CD1's phone is being monitored by police and that Boyd frequently asks CD1 to call him from a different phone.  Based on TFO Pappas's training, education, and experience, it is not uncommon for drug distributors to have numerous "dirty" or "burner" phones on-hand, and to frequently cycle through phones in an effort to thwart law enforcement.

In the presence of TFO Pappas, CD1 placed three recorded calls to TT1 on the evening of January 14 and into the early morning of January 15, 2016, and identified the man he spoke with as Boyd.  During a brief conversation in the early morning hours, CD1 and Boyd had an exchange using coded language that CD1 later explained dealt with a future drug transaction.  CD1 also explained that Boyd was speaking in code because he is cautious about the security of CD1's phone.  CD1 permitted TFO Pappas to examine a monthly statement from a credit union, which included several debit charges on CD1's account on December 23, 2015, in New York City and Long Island and thus corroborated that CD1 had visited New York shortly before Christmas.

On January 15, 2016, TFO Pappas requested, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, a warrant authorizing the acquisition of "specific latitude and longitude or other precise location information" for TT1 and directing AT&T, the service provider for TT1, to initiate a signal to determine the location of TT1 at such times and intervals as directed by law enforcement for a period of 30 days.  (Gov't Ex. 1.)

---

[5] The Court understands that Pappas ended his service as a federal task force officer in 2017, but was serving as such throughout the events at issue in this case.

[6] CD1 claimed that he had sought to arrange future drug transactions on behalf of law enforcement; however, CD1 had been specifically instructed not to do so by TFO Pappas.  Further, TFO Pappas believed that CD1 was minimizing the amount of drugs he was arranging to get from Boyd perhaps out of fear of further incriminating himself.

That same day, the Magistrate Judge in the District of Maine issued a search warrant for "property located in the Eastern District of New York and elsewhere," namely, the precise location information for TT1.  (Gov't Ex. 2.)  In the accompanying order, the Magistrate Judge stated, in relevant part:

> An application having been made by the United States for an Order pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, directing AT&T to assist agents of the [DEA] by providing all information, facilities and technical assistance needed to ascertain the physical location of [TT1], including but not limited to data indicating the specific latitude and longitude (or other precise location information) of [TT1], for a period of thirty (30) days;

> The Court finds that there is probable cause to believe that the Requested Information will lead to evidence of [crimes].

> IT IS HEREBY ORDERED pursuant to 18 U.S.C. § 2703(c)(1)(A) and [Rule 41] that AT&T beginning at any time within ten (10) days of the date of this Order and for a period not to exceed thirty (30) days from the date of this Order, provide to agents of the DEA the Requested Information concerning [TT1], with said authority to extend to any time of the day or night as required, including when [TT1] is outside of the District of Maine; all of said authority being expressly limited to ascertaining the physical location of [TT1] and expressly excluding the contents of any communications conducted by the user(s) of [TT1].

(D. Me. Docket # 2:16-mj-12-JHR, ECF No. 3, Page ID #s 13-14.)  The Order noted in a footnote that the requested information "shall, where other information is unavailable, include records reflecting the tower and antenna face ('cell site') used by [TT1] at the start and end of any call." (D. Me. Docket # 2:16-mj-12-JHR, ECF No. 3, Page ID # 13.)

TFO Pappas continued to listen to the calls between CD1 and TT1 with CD1's consent.[7] On January 15, 2016, CD1 received a call from TT1 in which Boyd informed CD1 that he was trying to "pull it together."  Boyd informed CD1 that he had about "fifty" left, and added, "I'm good on the up, it's just the down, I got fifty."  CD1 and Boyd agreed to speak the following day.

---

[7] Based on testimony at the suppression hearing, the Court understands that after the initial calls between CD1 and TT1, which were made in TFO Pappas's presence, CD1 consented to have his text messages and phone calls with TT1 intercepted remotely and was shown how to make outgoing calls in a manner that would facilitate their interception.

On January 16, Boyd told CD1 that something would happen "definitely, tomorrow." Boyd also confirmed that CD1 would be good to go on his end. CD1 and Boyd spoke on January 17, and Boyd informed CD1 that an associate was supposed to connect with Boyd in the morning but the "timing was off." Boyd also told CD1 that he wasn't sure of the associate's timing in making it past Boston on his way to Maine. Boyd told CD1 that if it didn't happen that night, he should be prepared for early the next morning. (See Gov't Ex. 11 at 4.) Based on the DEA officers' training, education, and experience, drug traffickers commonly use the terms "up" and "down" to refer to cocaine base and heroin, respectively. Based on the communications, it was clear to the DEA officers that Boyd was going to be sending a "runner" to deliver drugs to CD1 in Maine.

Beginning on January 17, 2016, TFO Pappas began receiving precise location information for TT1 placing it in the area of 107-41 154th Street in Jamaica, Queens.[8] However, the last known communication with TT1 was on January 17, and beginning on January 19, the location information for TT1 became imprecise or non-existent, perhaps because the phone had been powered off.

On January 18, Boyd contacted CD1 from (718) 314-0952 ("Target Telephone 2," or TT2") at approximately 5 a.m. Boyd informed CD1 that "he's getting on the connecting bus at 5:45 a.m." The call terminated before CD1 could acknowledge this information. Boyd and CD1 then exchanged text messages, with Boyd texting CD1, "Ok but he there for 8 this morn he getting on the Portland bus at 6 o'clock." (See Gov't Ex. 11 at 4-5.) Meanwhile, DEA agents accompanied by CD1 established surveillance at the Portland Transportation Center. At approximately 8:05 a.m., agents observed a man disembark a bus whom CD1 positively identified as "Mike," one of

---

[8] TFO Pappas testified at the hearing that he received emails in 15-minute increments from AT&T providing the location of the phone in latitude and longitude within ranges of approximately 30 meters (98 feet). TFO Pappas would then plug the latitude and longitude information into the Earth Point program available online, which would mark the location on a Google Earth image.

Boyd's runners who had delivered drugs to CD1 on previous occasions.  After agents approached Mike and detained him, a trained K-9 alerted positively for the presence of drugs on his person and a search produced 100 grams of cocaine base and 40 grams of heroin.  After Mike's arrest, he decided to cooperate and is hereinafter referred to as CD2.  CD2 has a lengthy criminal history, has admitted using cocaine base and heroin, and cooperated in the hopes of receiving prosecutorial and judicial consideration at sentencing.[9]

CD2 admitted he was delivering the drugs to CD1 (he identified CD1 by his first name) and provided an accurate physical description of CD1.  Although not initially forthcoming about the source of the drugs, when confronted with known facts regarding the investigation, CD2 admitted that he had been hired to deliver the drugs by a man who he claimed is known or identified as "Boy" in Maine and "Killer" in New York.[10]  CD2 described this man as a gang member and reported that he (CD2) was not the only runner in the man's drug operation.  CD2 eventually stated that the drug source's first name is "Curry" or "Carey" and that his wife's name is "Mimi."[11]

CD2 said he wasn't certain of "Boy's" address, but provided directions to the vicinity of 107-41 154th Street in Jamaica, Queens, and a physical description of the apartment building, which is where CD2 claimed to have been provided the drugs he brought on the bus to Maine.  Specifically, CD2 described how to get to the intersection three houses away from the apartment building, and accurately described the building exterior.  Both the directions and the physical description of the building provided by CD2 were consistent with the location that TFO Pappas had identified based on the location information for TT1.  CD2 was eventually shown a photograph

---

[9] At the suppression hearing, evidence was presented that CD2 had used drugs on the bus before being apprehended. It is unclear whether or not the DEA agents knew he was potentially under the influence of the drugs at the time he was questioned.

[10] It is not entirely clear whether "Boy" is an additional alias or simply a misunderstanding of "Boyd."

[11] The Court understands that the lack of clarity on the first name could be due to the DEA agents' inability to understand CD2's diction.

of the apartment building and confirmed that Boy resides on the second floor of the middle row of units. CD2 also disclosed that Boy uses a second "stash" house to store drugs, but CD2 did not know where that was located.[12]

On January 18 shortly after CD2 was taken into custody, Boyd contacted CD1 from TT2. Boyd told CD1 that he had received "down" from his "peoples" but that he had sent it back because the quality was poor. Boyd also told CD1 that he would send up another "250" in a couple of days. (See Gov't Ex. 11 at 6.) Again based on their training and experience, DEA agents understood "down" to be a reference to heroin and that Boyd was informing CD1 that he would be in a position to send him another 250 grams of heroin that week. This conversation occurred before Boyd learned that CD2 had been arrested. In two subsequent calls with Boyd at TT2, CD1 informed Boyd that something had happened to CD2, and Boyd suggested that CD1 would have to travel out of Maine for any future meets.

At approximately 6:33 p.m. that day, CD1 contacted Boyd at TT2 and discussed CD2's arrest. Boyd told CD1 that he was going to be getting another phone because he had called CD2 from that number. Boyd and CD1 also agreed it was a good thing Boyd had not sent the "400," which the agents understood to mean 400 grams of cocaine base and 400 grams of heroin that Boyd and CD1 had previously discussed. Boyd subsequently texted CD1 with CD2's full name

---

[12] At the suppression hearing, the Government presented additional evidence that CD2 was read his Miranda rights prior to his interview and agreed to speak with the agents; that he told them he had previously made multiple drug running trips to Maine for his source; that he had acquired the drugs at the source's residence; that the source drove several vehicles, including a Nissan Quest with a custom dashboard, which was consistent with information previously provided by CD1; and that CD2's fiancée was a familial relation to the source. CD2 described previously observing drugs, a scale, a money counter, and at least one firearm inside the 154th Street apartment. CD2 also told the agents that the source's nephew was residing with him at the apartment and had a warrant for his arrest for a violent offense. CD2 consented to a search of his cell phone and the police found contact information for TT2 and CD1. Several agents subsequently took CD2 around Androscoggin County and he pointed out several locations that were then being investigated or had been investigated for connections to drug trafficking.

and date of birth so that CD1 could post bail.[13]  The next day, January 19, CD1 contacted Boyd at TT2 and told him that he was planning to drive to New York on January 20.

On January 20th, DEA TFO Brian Nappi applied for, and the Magistrate Judge in the District of Maine issued, a warrant for precise location information for TT2 subject to the same conditions as the previous warrant for TT1.  Pursuant to the warrant, DEA agents collected precise location information for TT2 beginning on January 20 or 21.[14]

Meanwhile, TFO Pappas had sent the information from the interview with CD2 in Maine to DEA agents in New York, who established surveillance at the 154th Street apartment (hereinafter, "the apartment").  The agents observed a Nissan high-occupancy passenger van (sometimes referred to as a "bus" in the record) in the vicinity registered to a Latoya Ackies.  At some point, the New York agents sent a booking photograph of Carey Ackies to Maine and it was shown to both CDs.  CD1 could not confirm Boyd's identity because the picture looked "a lot meaner" than how Boyd looked in person.  CD2 positively identified the man he knew as Curry/Carey, Killer, or Boy.

On January 19, TFO Pappas and other investigators drove to New York City to conduct surveillance in the vicinity of the apartment.  The surveillance continued sporadically from the 19th through the 22nd and the investigators observed the Nissan van as well as a Nissan Quest registered to a Tyree or Terry Ackies in the vicinity.  During this period, location information placed TT2 at the apartment on multiple occasions and at various times, including in the middle of the night.

---

[13] During this conversation, a recording and transcript of which was admitted at the suppression hearing, Boyd also confirmed that he has some type of close familial or personal connection to CD2's fiancée.

[14] As described at the suppression hearing, the Court understands that the location data for TT2 was likely sent from AT&T to TFO Nappi, who shared it with TFO Pappas.

On January 21, TFO Pappas met with a task force officer from the FBI along with a district attorney in New York to begin to draft a search warrant for the apartment. Also that day, CD1 informed Boyd that he was en route to New York and, later, that he had arrived in the city. Throughout the early morning hours of January 22, CD1 received a flurry of phone calls and text messages from TT2, but TFO Pappas directed CD1 not to respond. At some point, TFO Pappas also received information from New York City police that Ackies had previously been stopped and given the apartment address as his residence.

On January 22, 2016, at approximately 9:00 a.m., while on surveillance in the vicinity of the apartment, TFO Pappas received precise location information placing TT2 at an address nearby. At the time, investigators observed the Nissan van, but not the Quest, in the vicinity of the apartment. After the investigators drove to TT2's location, they spotted the Quest parked on the street in front of a supermarket. Around 10:20 a.m., TFO Pappas observed Ackies exit the supermarket with a grocery cart and begin to load groceries into the Quest. Investigators, who were in plainclothes with insignia identifying them as law enforcement and were armed, then took Ackies into custody and handcuffed him.[15] Ackies did not resist arrest, shout at the officers, or otherwise act belligerently. A search of Ackies's person incident to his arrest produced three cell phones, including what was confirmed at the scene to be TT2, a little over $800, and an identification card, which listed an address other than the 154th Street apartment. Between six and ten law enforcement personnel were involved in the operation, but it is not entirely clear how many were in Ackies's presence at any given time. Ackies had previously been arrested and convicted multiple times for a variety of offenses, including drug-related crimes.

---

[15] TFO Pappas testified that Ackies was directed to the ground during the arrest based on a concern that he could be carrying a weapon, but the Court does not credit Ackies's unsupported allegations that his arrest involved excessive force and resulted in facial injuries.

Ackies agreed to have the officers load his groceries into the Quest and drive it away.  He was placed in the vehicle of Special Agent ("SA") Diette Ridgeway, the group supervisor of the DEA enforcement group based in New York City.  SA Ridgeway and TFO Pappas drove Ackies to a pre-determined location 5-7 minutes' drive away from the supermarket.[16]  The officers moved quickly because of their desire to neutralize any firearms that may have been in the apartment. During the ride, SA Ridgeway and TFO Pappas introduced themselves and explained the state of the investigation.  SA Ridgeway also correctly recited the <u>Miranda</u> warnings to Ackies from memory; she has previously recited them from memory hundreds of times in her 17-year career with the DEA.

During his interactions with the officers, Ackies was coherent, seemingly not under the influence of drugs or alcohol, and appeared to understand everything that he was told.  He acknowledged that he understood his rights, but repeatedly stated that he wanted to cooperate and expressed a willingness to answer questions.  At some point, Ackies made incriminating statements and provided answers to the investigators' questions.[17]  Specifically, he told the investigators that he resided at the apartment; that he owned two vehicles, the Quest and the van, and that he had paid $33,000 for the van; that the apartment contained around 100 grams of cocaine base and a firearm; and that his pregnant companion, a two-year-old child, and his nephew, who had an outstanding warrant for his arrest, were all staying at the apartment.[18]

---

[16] Although the officers did not want to identify the location during the hearing because it is frequently used for law enforcement operations, it seems likely, based on the testimony, to have been a public park.

[17] The Government admits that Defendant's statements and answers were the product of custodial interrogation, with the exception of one statement that the Government contends was a spontaneous utterance.  (<u>See</u> Gov't's Consolidated Resp. to Def.'s Mots. to Suppress (ECF No. 122), Page ID # 318.)

[18] The exact relationship between the pregnant woman, Schamia Taylor, and Ackies was a source of uncertainty throughout the record.  At the hearing, Taylor testified that she and Ackies have been in a multi-year, on-again, off-again relationship, and that they have seven children together.

The questioning continued once SA Ridgeway, TFO Pappas, and Ackies arrived at the secondary location, where the Quest was already being searched.[19]  At some point, Ackies was asked if he would consent to a search of the apartment and was told that the officers would seek a search warrant if he did not consent.  Ackies said he would consent and signed a DEA consent form.  At the time he signed the form, Ackies was in the presence of TFO Pappas and another TFO and was either in the backseat or just outside SA Ridgeway's vehicle.  Ackies was either handcuffed in front of his body or his handcuffs were off.  Before signing, Ackies had an opportunity to review the written form, which states, "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY" and "I FREELY CONSENT TO THIS SEARCH."  (Gov't Ex. 16.)  The officers also explained the scope of the search—that they would be looking for the firearm and drugs.

The officers then formulated a plan with the full cooperation of Ackies to lure his nephew out of the apartment.  Ackies agreed to call the apartment and say he needed his nephew's help bringing up the groceries.  Officers separately drove Ackies and the Quest back to the vicinity of the apartment, and Ackies was provided with one of the cell phones seized from him pursuant to his arrest.  Ackies called the apartment and his nephew exited and was peacefully taken into custody.[20]

Although the exact order of events at this point is not entirely clear, some number of officers went up to the apartment and spoke with Schamia Taylor.[21]  At some point, SA Ridgeway and TFO Pappas went up to the apartment, informed Taylor that Ackies had provided consent to

---

[19] Defendant is not seeking to suppress anything found during this search.

[20] It was later determined that the active warrant for the nephew, Christopher Sampson, was for something other than a violent offense.

[21] The Court assumes without deciding that these officers performed a quick safety check of the apartment.

search the apartment, and showed her the signed consent form.  Taylor then verbally consented to

a search.  Several officers were inside the apartment and assisted with bagging evidence, but TFO

Pappas was the sole officer responsible for conducting the search and taking pictures.  TFO Pappas

located a loaded firearm, a small amount of heroin, a digital scale, a money counter, numerous cell

phones, and unused baggies, which appeared to him to be the type used in heroin distribution.[22]

## II. DISCUSSION

The Court considers Defendant's Motions in the most logical order for addressing the legal

and factual issues he raises.

### A.  Motion to Suppress Evidence Obtained Pursuant to a Search Warrant Issued Without Probable Cause (ECF No. 109)

Defendant moves for suppression of all evidence derived from the January 15, 2016, search

warrant for precise location information from TT1.[23]  "[E]xamin[ing] the affidavit in a practical,

common-sense fashion and accord[ing] considerable deference to reasonable inferences the

[Magistrate Judge issuing the warrant] may have drawn from the attested facts," United States v.

Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (quotation marks omitted), and considering the "totality

of the circumstances," United States v. Pérez-Díaz, 848 F.3d 33, 40 (1st Cir. 2017) (quotation

marks omitted), the Court concludes that the TT1 warrant was supported by probable cause.  See

United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) ("In order to establish probable cause, the

---

[22] Ackies was asked about the location of the 100 grams of cocaine base he had mentioned, and he said that it had possibly been transferred to another location by Sampson.  Sampson confirmed that he had transferred the cocaine base to another person on Ackies's behalf.  Ackies agreed to help the officers track down the drugs and, to that end, made at least one call from one of the cell phones that had been seized from him during his arrest.  However, Ackies was not able to reach any of his associates.  He told the officers that he was on the phone with one of his associates at the time of his arrest and speculated that this associate probably tipped the others off.  Before the officers left the scene with Ackies, they allowed Taylor to speak with him and gave her the money found in Ackies's wallet so that she could pay the rent.

[23] Defendant does not contend that the warrant for TT2 was not supported by probable cause, and, for purposes of deciding ECF No. 107, the Court determines that the warrant for TT2 was so supported.

facts presented to the magistrate need only warrant a man of reasonable caution to believe that evidence of a crime will be found.") (quotation marks omitted).

Although the bulk of the information supporting probable cause came from an informant, CD1, who had at times misled the Government, the Court concludes that the Magistrate Judge could have determined that CD1's information connecting TT1 to drug trafficking activity was reliable. Specifically, CD1 provided credible information based on his own involvement with drug trafficking activities and his history of providing information to law enforcement that led to arrests and convictions; his information was based on his first-hand knowledge; his information was corroborated by TFO Pappas's independent investigation of CD1's activities as well as the interception of the communications between CD1 and the user of TT1; and, finally, TFO Pappas had reasonably assessed, based on his training and experience, that the communications between CD1 and the user of TT1 concerned drug trafficking. See United States v. White, 804 F.3d 132, 137 (1st Cir. 2015) ("The First Circuit has identified a non-exhaustive list of factors to examine in deciding on an informant's reliability: (1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information.") (quotation marks omitted).

Defendant contends in particular that "[t]he text messages and phone calls referenced by TFO Pappas in the affidavit do not mention the sale of drugs in any way" (ECF No. 109, Page ID # 267), but the Magistrate Judge could have credited TFO Pappas's reasonable conclusion based on his training and experience in the field of drug enforcement that the communications used coded language to discuss drug trafficking activities. See United States v. Dunston, 851 F.3d 91, 96 (1st

Cir. 2017) (recognizing, in the context of providing testimony at trial, that experienced DEA agents are qualified to "translate" coded language in drug-related communications).  Given the coded and vague nature of the communications, it is also not surprising that they did not exactly corroborate the details of the drug transactions described by CD1 to TFO Pappas.

Finally, even if there was no probable cause to support the TT1 warrant, the Court determines that the Leon good-faith exception would apply and that, therefore, suppression would not be appropriate.  See United States v. Leon, 468 U.S. 897, 920-21 (1984) (holding that suppression is not appropriate where an objectively reasonable law enforcement officer relied in good faith on a defective warrant).

The Court therefore DENIES this Motion (ECF No. 109).

B.  Motion to Suppress Evidence Obtained as a Result of the Issuance of Two Precise Location Information Search Warrants (ECF No. 107)

Defendant moves to suppress all evidence derived from the precise location information warrants for TT1 and TT2 because he contends that the Magistrate Judge was not authorized to issue these warrants.  The Court understands Defendant to be making two separate arguments leading to the same result.  First, Defendant argues that the Magistrate Judge was not authorized to issue the warrants because the Government's acquisition of the precise location information (or, "PLI")[24] amounted to the use of a "tracking device" within the meaning of 18 U.S.C. § 3117.  Second, Defendant argues that, separate from consideration of the tracking device issue, the

_____

[24] In the following sections, the Court uses "PLI" as shorthand for any cell phone location information, including GPS or latitude-longitude data and less precise cell-site location information, which "indicate[s] which cell tower—usually the one closest to the cell phone—transmitted a signal when [a person] used [his or her] cell phone[] to make and receive calls and texts."  United States v. Graham, 824 F.3d 421, 424 (4th Cir. 2016) (en banc).  The Court differentiates between the types of location data where necessary.

Magistrate Judge's issuance of the warrants violated Federal Rule of Criminal Procedure 41(b). The Court first outlines the relevant law and then turns to an analysis of Defendant's arguments.

    i.  Legal Background

It is well-established "that a warrant must generally be secured" in order for a search to comport with the Fourth Amendment. <u>Kentucky v. King</u>, 563 U.S. 452, 459 (2011). Federal Rule of Criminal Procedure 41 "provides a general default procedure that governs searches and seizures" and the issuance and execution of search warrants in most circumstances. <u>United States v. Espudo</u>, 954 F. Supp. 2d 1029, 1032 (S.D. Cal. 2013). Regarding "Venue for a Warrant Application," Rule 41 provides,

> At the request of a federal law enforcement officer or an attorney for the government:
>
> **(1)** a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district;
>
> **(2)** a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;
>
> **(3)** a magistrate judge--in an investigation of domestic terrorism or international terrorism--with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;
>
> **(4)** a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and
>
> **(5)** a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:
>
> > **(A)** a United States territory, possession, or commonwealth;

(**B**) the premises--no matter who owns them--of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land used for the mission's purposes; or
(**C**) a residence and any appurtenant land owned or leased by the United States and used by United States personnel assigned to a United States diplomatic or consular mission in a foreign state.

(**6**) a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if:

(**A**) the district where the media or information is located has been concealed through technological means; or
(**B**) in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

Fed. R. Crim. P. 41(b).  Although Rule 41 may govern in many instances, it also explicitly provides that it "does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances."  Fed. R. Crim. P. 41(a)(1).

Regarding a magistrate judge's general authority to issue a search warrant, the Federal Magistrates Act provides, in relevant part,

(**a**) Each United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law--

(**1**) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts . . . .

28 U.S.C. § 636(a)(1).

By law, specific procedures apply to a warrant for a "mobile tracking device," with "tracking device" defined as "an electronic or mechanical device which permits the tracking of the movement of a person or object."  18 U.S.C. § 3117(b).  "If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of

that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction."  Id. § 3117(a).

A different statute, commonly known as the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712, governs, inter alia, warrants for records of any "electronic communication," which is defined as

> any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—
>
> (A) any wire or oral communication;
> (B) any communication made through a tone-only paging device;
> (C) any communication from a tracking device (as defined in section 3117 of this title); or
> (D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds[.]

18 U.S.C. § 2510(12).  The SCA provides in relevant part regarding the acquisition of "[r]ecords concerning electronic communication service," that

> (1) A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity--
>
> (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction . . . .

18 U.S.C. § 2703(c)(1)(A).  For purposes of the SCA, "court of competent jurisdiction" is defined to include "any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that . . . has jurisdiction over the offense being investigated [or] is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored."  18 U.S.C. § 2711(3)(A).

Along with other means of accessing electronic information not relevant to the present matter, the SCA also provides that the Government may obtain electronic communication records from a service provider by obtaining a court order upon an offer of "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought[] are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). The SCA therefore provides two major paths for the Government to obtain records of electronic communications: (1) the Government may seek a warrant based on probable cause and consistent with the procedures outlined in Federal Rule of Criminal Procedure 41; or (2) the Government may seek a court order based on the "specific and articulable facts" standard.

Several appellate courts have recently held that PLI constitutes records of electronic communications and can therefore be obtained pursuant to the SCA. See United States v. Graham, 824 F.3d 421, 426 (4th Cir. 2016) (en banc) (concerning historical cell-site location information); United States v. Wallace, 857 F.3d 685, 691 (5th Cir. 2017) (concerning prospective, or "real-time" location information, including GPS data).[25]  Once information falls within the scope of the SCA, courts have also held that the SCA provision allowing a warrant to be issued by any "court of competent jurisdiction," rather than the specific provisions governing magistrates in Rule 41(b), governs.  See United States v. Berkos, 543 F.3d 392, 397-98 (7th Cir. 2008); United States v. Scully, 108 F. Supp. 3d 59, 83 (E.D.N.Y. 2015); see also United States v. Henshaw, 15-339-01-

---

[25] To the extent courts have held that cell phone location information falls completely outside the purview of the Fourth Amendment, see, e.g., United States v. Carpenter, 819 F.3d 880, 889-90 (6th Cir. 2016), cert. granted, 137 S. Ct. 2211 (2017), the Court need not embrace this view to decide the present matter because the Government obtained the location information in this case through warrants supported by probable cause.  For this reason, the Court also need not predict how the Supreme Court would apply its decision in United States v. Jones, 565 U.S. 400 (2012), which involved a physical intrusion by the Government to install a GPS tracking device on a vehicle, to cell phone location information.

Because of the recent straightforward appellate case law, the Court eschews consideration of the byzantine "hybrid theory," which places PLI within the ambit of the SCA through a multi-step deductive process originating with the Pen Register Statute.  See United States v. Booker, No. 1:11-CR-255-1-TWT, 2013 WL 2903562, at *7 (N.D. Ga. June 13, 2013) (explaining the "hybrid theory").

CR-W-BP, 2017 WL 1148469, at *3 (W.D. Mo. Feb. 24, 2017) (magistrate's recommended decision collecting cases upholding "courts' ability to issue warrants outside their respective district under the SCA"), adopted by 2017 WL 1147494 (W.D. Mo. Mar. 27, 2017).

  ii.  Analysis

Defendant's first argument is that the Government's acquisition of the PLI was tantamount to the use of a tracking device, and therefore that the warrant had to have been issued in compliance with 18 U.S.C. § 3117.  The Court disagrees.  In a sense, the warrants did allow the Government to "track" the movements of TT1 and TT2.  However, Section 3117's plain language, which speaks of "the *installation* of a mobile tracking *device*," appears to contemplate the putting in place of tracking hardware rather than the acquisition of location data.  18 U.S.C. § 3117(a) (emphasis added); see also Fed. R. Crim. P. 41(b)(4), (e)(2)(C), (f)(2)(A) (provisions governing the "installation" of tracking devices).  Furthermore, even if the Government's acquisition of data could somehow be analogized to installing a device, it could be exceedingly difficult in situations involving PLI to determine where "installation" is to occur; the Government may be seeking data concerning a cell phone whose present location is unknown.  See In re Application of the U.S. for an Order for Authorization to Obtain Location Data Concerning an AT&T Cellular Tel., 102 F. Supp. 3d 884, 893-895 (N.D. Miss. 2015) (discussing why Section 3117 is a poor fit for the acquisition of cell phone location data); In re Smartphone Geolocation Data Application, 977 F. Supp. 2d 129, 148-50 (E.D.N.Y. 2013) (same).[26]

---

[26] The Court recognizes that many courts have determined that Section 3117 may govern the issuance of a search warrant for real-time cell phone location information.  For example, the sole case cited by Defendant on the tracking device issue is a Maryland case holding that "if the government seeks to use a particular cellular telephone as a tracking device to aid in execution of an arrest warrant, the government must obtain a tracking device warrant . . . in accord with 18 U.S.C. § 3117."  In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F. Supp. 2d 526, 537 (D. Md. 2011).  Putting aside that the Maryland case is factually distinguishable because it involves use of precise location information specifically to effect a suspect's arrest, this Court is simply not persuaded by its reasoning and the reasoning of other decisions in this vein.

Defendant's second argument has more heft.  The Court agrees with Defendant that if the limits on a magistrate judge's authority in Rule 41(b) apply to the two warrants at issue, the warrants do not appear to have been issued in compliance with the rule; the Government sought information located outside the District of Maine and none of the applicable exceptions allowing a magistrate judge to issue a warrant for information outside his or her district applies.  However, the Court concludes that, even assuming a violation of Rule 41(b) for the purpose of deciding Defendant's Motion, suppression would not be appropriate.

The purpose of the exclusionary rule is "to deter police misconduct."  Leon, 468 U.S. at 916.  Under the "good-faith" exception to the warrant requirement, courts will not suppress evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  Leon, 468 U.S. at 922.  Since Leon, courts have increasingly defined "good faith" in terms of what it is not: "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."[27]  Herring v. United States, 555 U.S. 135, 144 (2009).  As the Supreme Court has explained, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system" in suppressing evidence of criminal activity.  Id.  Even when Constitutional rights have been violated, the exclusionary rule should

---

[27] In  Leon, the Supreme Court identified several specific scenarios where an officer's reliance on a search warrant would not be "objectively reasonable": where the magistrate or judge did not act in a neutral and detached manner; where the warrant affidavit contained information the affiant knew or should have known was false; where the warrant affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and where the warrant is so facially deficient "that the executing officers cannot reasonably presume it to be valid."  United States v. Leon, 468 U.S. 897, 923 (1984) (quotation marks omitted).  None of these scenarios is present in this case.

only be applied where "it result[s] in appreciable deterrence" and "the benefits of deterrence . . . outweigh the costs." Id. at 141 (alteration in original) (quotation marks omitted).[28]

The Court sees no indication that any failure to seek authorization for the PLI warrants from an Article III judge rather than the Magistrate Judge amounted to "deliberate, reckless, or grossly negligent conduct" by the Government.[29] Regarding whether any error was deliberate, the Court cannot discern any apparent benefit the Government received from appearing before the Magistrate Judge rather than before an Article III judge. Because the Government received no benefit, it is unclear that there would be much deterrent value in suppressing the resulting evidence. See United States v. Monell, 801 F.3d 34, 41-42 (1st Cir. 2015) (noting, in evaluating a claimed error by a detective in obtaining a warrant, that "[n]o officer could have had any reason to deliberately make the error here," and thus concluding that declining to suppress the resulting evidence "gives no other officer any incentive" to commit the same error).

Nor can the Court discern any indication that the police acted recklessly or with gross negligence considering the state of the law on PLI warrants. As described above, several appellate courts have held that cell phone location data falls within the ambit of the SCA,[30] which means that the limits on a magistrate judge's authority in Rule 41(b) do not necessarily apply.[31] See supra

---

[28] The First Circuit has outlined a distinct procedure for considering violations of Rule 41 that are "ministerial" in nature. See United States v. Burgos-Montes, 786 F.3d 92, 109 (1st Cir. 2015). For the purpose of deciding the present matter, the Court assumes that a Rule 41(b) violation is substantive rather than ministerial.

[29] The Court is not aware of, and the parties have not pointed the Court to, any authority suggesting that an Article III judge in the District of Maine could not, or would not, have issued the subject warrants.

[30] The Court notes that there has been strenuous disagreement in the district courts regarding whether the SCA covers warrants for real-time cell phone location information, such as the information acquired in this case. See United States v. Jones, 908 F. Supp. 2d 203, 208 n.5 (D.D.C. 2012) (compiling majority of district court decisions concluding that a warrant for prospective cell phone location information cannot be obtained pursuant to the SCA).

[31] Although the Court need not, and does not, decide whether Rule 41(b) applies to warrants for information within the ambit of the SCA, the view that Rule 41(b) does not apply has a certain logical force. In particular, the Court notes that, because 18 U.S.C. § 2703(d) does not mention Rule 41 and only speaks of "a court of competent jurisdiction," applying Rule 41(b) to warrants issued pursuant to the SCA would mean that the Government faces greater jurisdictional hurdles in seeking a warrant based on probable cause than it faces in seeking an order based on a mere

at 18-19.  Given the unsettled state of the law, and the fact that the First Circuit has yet to definitively speak on the applicability of Rule 41(b) to warrants for cell phone location information, the Court cannot see how the Government's behavior in this matter could be deemed reckless or grossly negligent.  See United States v. Darby, 190 F. Supp. 3d 520, 538 (E.D. Va. 2016) (in declining to suppress evidence, noting, "there is no evidence that any failure by the FBI to understand the intricacies of the jurisdiction of federal magistrates was deliberate"); see also Espudo, 954 F. Supp. 2d at 1044 (declining to suppress evidence whether there was no "clear, controlling case explicitly stating that the government" could not obtain information in the manner it did).

Finally, suppressing evidence derived from the PLI warrants would not have an appreciable deterrent effect on the police given that it is the magistrate judge's ultimate responsibility to determine if he or she has authority to issue a particular warrant.  See Leon, 468 U.S. at 916 (noting that the purpose of the exclusionary rule is "to deter police misconduct rather than to punish the errors of judges and magistrates"); United States v. Broy, 209 F. Supp. 3d 1045, 1058 (C.D. Ill. 2016) (noting, in declining to suppress evidence in a case involving a magistrate judge's issuance of a warrant in violation of Rule 41(b), that "the only benefit to suppression in this case would be ensuring magistrate judges are more careful about issuing [a particular type of warrant] in the future").

---

showing of "specific and articulable facts."  This is an absurd result that could well discourage the Government from seeking warrants as opposed to court orders.

Considering, then, that the deterrent effect on police behavior of suppression in this case would be minimal at best, the Court cannot ignore the substantial social costs of suppressing evidence that was obtained pursuant to warrants issued upon a showing of probable cause.  See Herring, 555 U.S. at 141 ("[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.") (alterations in original) (quotation marks omitted).  The Court therefore joins the majority of courts, including the majority of courts in this Circuit, that have declined to suppress evidence based on a Rule 41(b) violation.  See, e.g., United States v. Allain, 213 F. Supp. 3d 236, 251-52 (D. Mass. 2016); United States v. Anzalone, 208 F. Supp. 3d 358, 372 (D. Mass. 2016).[32]

The Court is not persuaded by those courts that have taken a different tack.  A minority of courts have determined that a warrant issued by a magistrate judge in violation of Rule 41(b) is *void ab initio* and, therefore, that suppression is necessary.  See United States v. Levin, 186 F. Supp. 3d 26, 41 (D. Mass. 2016) (stating that a warrant *void ab initio* is "akin to no warrant at all" and noting the good-faith exception does not apply to warrantless searches), appeal docketed, No. 16-1567 (1st Cir. May 20, 2016).  But to characterize the warrants at issue in this case as void at the outset and base suppression on this characterization elevates a legal fiction at the expense of the core considerations behind the exclusionary rule discussed above.  In this case, when the Government acquired the precise location data, it indisputably had search warrants in hand that had been issued by a magistrate judge upon a showing of probable cause.  That the warrants may have been issued in error is exactly the type of situation contemplated when a court determines

---

[32] Many courts, including the courts in Allain and Anzalone, have considered whether Rule 41(b) violations necessitate suppression in the context of warrants authorizing the deployment of a "Network Investigative Technique," or "NIT," which is a program that can identify IP addresses on a target's computer.  "The vast majority of courts" have determined that suppression was not appropriate.  See United States v. Sullivan, 1:16-cr-270, 2017 WL 201332, at *3 (N.D. Ohio Jan. 18, 2017) (collecting cases).  Although the legal issues involved with NIT warrants are somewhat distinct, the NIT cases are instructive in so far as they deal with suppression where a magistrate judge's issuance of a warrant does not comply with Rule 41(b).

whether law enforcement reasonably relied on an invalid warrant and applies the good-faith exception.[33]

For these reasons, the Court concludes that suppression of evidence would not be appropriate even assuming that the Magistrate Judge erred in issuing the warrants for precise location information from TT1 and TT2.[34]   The Court therefore DENIES this Motion (ECF No. 107).

### C.   Motion to Suppress Evidence Obtained as a Result of Warrantless Arrest Not Supported by Probable Cause (ECF No. 108)

Defendant moves to suppress all evidence deriving from his warrantless arrest because he contends it was not supported by probable cause.   It is well-established that, in general, a warrantless arrest must be based on probable cause.   United States v. Fiasconaro, 315 F.3d 28, 34 (1st Cir. 2002).   In this case, the Court readily determines that Defendant's arrest was supported by probable cause that Defendant was involved in drug trafficking.   As outlined above, there was probable cause to believe that the user of TT1 and TT2 was engaged in drug trafficking.   The information supplied by the cooperating defendants and the surveillance in the vicinity of the 154th Street apartment tied Defendant to the phones and to the apartment from which CD2 claimed to

---

[33] The court in Levin also relied on cases in the Sixth Circuit that have been overruled by that court and misapplied the First Circuit's wholly inapposite decision in United States v. Curzi, 867 F.2d 36 (1st Cir. 1989), which involved officers essentially searching a dwelling without any prior judicial authorization.   United States v. Krueger, which was also cited by the district court in Levin, is inapposite to the matter at hand because, in that case, the Tenth Circuit determined that a Kansas magistrate judge's issuance of a warrant to search property in Oklahoma clearly violated Rule 41(b) and thus constituted "gross negligence" warranting suppression.   809 F.3d 1109, 1117 (10th Cir. 2015). In any event, other courts have not taken the strict approach to errors involving the judicial officer's authority to issue a warrant taken by the court in Krueger.   See, e.g., United States v. Master, 614 F.3d 236, 242-43 (6th Cir. 2010) (holding that the good-faith exception could apply where the police relied on a warrant issued by a state judge who was not authorized by state law to issue the warrant.)

[34] To be entirely clear, because the warrants were issued upon a showing of probable cause in this case, the Court need not, and does not, opine on the degree to which a person has a reasonable expectation of privacy in cell phone location data or how the analysis may be informed by the specificity of the data (e.g., CSLI vs. GPS) and the length of time for which the Government collects the data.

have picked up the drugs he brought to Maine.  By the point that the real-time location information from TT2 and the direct observations of law enforcement placed Defendant and the phone at the same location on January 22, 2016, if not before, there was probable cause to arrest Defendant.

In contending otherwise, Defendant reasonably points to the fact that he was never observed entering or exiting the 154th Street apartment before his arrest and the fact that CD1 could not confirm "Boyd's" identity when presented with Defendant's photograph.  Probable cause, however, means "a fair probability," United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (quotation marks omitted), not absolute certainty.  See Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").  The lacunae in the information connecting Defendant to drug trafficking do not negate the large amount of information pointing to a fair probability that he was engaged in that activity.

The Court therefore DENIES this Motion (ECF No. 108).

### D. Motion to Suppress Evidence Obtained from Miranda Violation and Invalid Consent Search (ECF No. 116)

Defendant moves to suppress statements he made and evidence seized from the 154th Street apartment based on his contentions (i) that he was never advised of his Miranda rights, and (ii) that he did not voluntarily consent to the search of the apartment.[35]

Regarding Defendant's Miranda claim, the Court credits SA Ridgeway and TFO Pappas's testimony that SA Ridgeway correctly recited the Miranda warnings to Defendant; that Defendant

---

[35] After the suppression hearing on June 29-30, 2017, the Government submitted a memorandum contending that by denying that he resided at the 154th Street apartment, Defendant essentially disclaimed standing to challenge the search.  See Gov't's Post-Hearing Memo. in Opp'n to Def.'s Mot. to Suppress Evidence Obtained from a Consent Search (ECF No. 142).  In light of the strong evidence that Defendant did reside at the 154th Street apartment, the Court concludes that Defendant does have standing to challenge the search and proceeds to analyze whether his consent to the search was voluntary.

indicated he fully understood his rights; and that he clearly indicated his willingness to cooperate with the police and to answer their questions. The Court simply does not credit Defendant's contention to the contrary. The Court also rejects Defendant's suggestion that the officers were required to obtain his signature on a Miranda waiver form before speaking with him. See United States v. Coombs, 857 F.3d 439, 450 (1st Cir. 2017) (noting that "neither a signed waiver . . . nor any other form of documentation is required" to effectuate a waiver of Miranda rights).

Furthermore, to the extent Defendant suggests that his Miranda waiver was not voluntary, knowing, and intelligent, the Court readily finds by a preponderance of the evidence that Defendant's waiver met these criteria based on the officers' testimony that Defendant understood his rights, indicated a desire to cooperate, and did not in any way provide a reason to doubt the voluntariness of his waiver. See Coombs, 857 F.3d at 450 ("Here, the government produced evidence that the officers not only read the appellant his rights but also received his verbal assurances that he understood those rights . . . The officers testified . . . that he was cooperative and responsive during the interview and that there was no reason to doubt the voluntariness of his waiver."). Beyond the credible testimony of the officers, and the lack of evidence suggesting that Defendant's Miranda waiver was not voluntary, Defendant also has been arrested multiple times before and testified that he is well aware of his Miranda rights.

Regarding Defendant's consent to search claim, the Court first notes that Defendant signed a form clearly stating he was freely consenting to the search. See United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (approving district court's consideration "of the written consent form, in which the [Defendants] explicitly stated that they gave their consent freely and voluntarily"). However, the Court does not stop at the consent form, but "look[s] to the totality of circumstances, including [Defendant]'s age, education, experience, intelligence, and knowledge of the right to withhold consent," and considers whether Defendant "was advised of his . . . constitutional rights

and whether permission to search was obtained by coercive means or under inherently coercive circumstances." United States v. Dion, 859 F.3d 114, 129 (1st Cir. 2017) (quotation marks omitted); see also United States v. Bey, 825 F.3d 75, 80 (1st Cir. 2016) ("The presence of coercion is a question of fact based on the totality of the circumstances, including the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place.") (quotation marks omitted).

The Court finds that Defendant was informed of his right to refuse consent before he signed the form, that he expressed a willingness to cooperate, and that the tenor of the interactions between the officers and Defendant was not hostile or confrontational. See Dion, 859 F.3d at 130 (noting that the defendant was extremely willing to cooperate and that "the conversational tone and nature of the encounter belies any suggestion that the [defendant's offers to the police to search his vehicle] were coerced"). Nor does the Court perceive any evidence of improperly coercive tactics on the part of the officers. They told Defendant that they would seek a search warrant for the apartment if he did not consent to a search, but this was not inherently coercive because "[p]robable cause had been established and the officers had a good faith belief that a warrant would issue." United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003); see also United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015) ("Nor was [defendant]'s voluntary consent negated by the fact that it was secured by the detective's statement that the apartment would be searched eventually, with or without his consent.")

Defendant was, at the time of his arrest, a 34-year-old man who had been arrested multiple times: "this wasn't [Defendant]'s first rodeo: [his] age and experience tells [the Court] that he knew that he could refuse to consent." Dion, 859 F.3d at 130. The fact that Defendant was under arrest at the time he consented, and was in the immediate presence of at least three officers, does

not change the analysis.  See United States v. Ramdihall, 859 F.3d 80, 89 (1st Cir. 2017) ("A person who is lawfully detained may still voluntarily give consent to a search"); Bey, 825 F.3d at 80 (citing cases explaining that being handcuffed, placed in a separate room, or surrounded by multiple armed officers is not "inherently coercive").  Finally, the court credits the officers' testimony that Taylor verbally consented to the search of the apartment after inspecting the consent form signed by Defendant.[36]

The Court therefore DENIES this Motion (ECF No. 116).

E.   Motion to Suppress Intercepted Communications (ECF No. 118)

Finally, Defendant moves to exclude from use at trial the phone calls and text messages between CD1 and Defendant based on his contention that TFO Pappas did not obtain prior consent from CD1 to intercept these communications.  Title 18 U.S.C. § 2511 restricts the use of intercepted communications, but specifically provides, "It shall not be unlawful . . . for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).[37]

TFO Pappas testified that CD1 expressly consented to have the calls and texts intercepted and additionally explained that CD1 had to undertake certain procedures before calling the target numbers in order to facilitate the interception.  Other than a bald assertion to the contrary,

---

[36] In general, the Court finds the hearing testimony of both Defendant and Taylor to lack in credibility.  Specifically, Defendant made several completely unsubstantiated allegations at the hearing, including that he was injured during his arrest and that the pretrial services officer misrepresented Defendant's answers in the bail report.  Under cross-examination, Defendant essentially admitted that he had lied in his direct testimony about his livelihood and drug trafficking activity.  Taylor similarly made multiple unsubstantiated allegations about police conduct on the day of Defendant's arrest and offered testimony about Defendant's presence at the apartment that was called into serious question by the cell phone location data.

[37] "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the usage of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

Defendant has not presented any evidence to suggest that CD1 did not so consent.  In fact, it is entirely reasonable to conclude that CD1, who was represented by counsel at the time of the intercepted communications, was actively cooperating with the authorities in hopes of receiving prosecutorial and judicial consideration.  See United States v. Burford, 755 F. Supp. 607, 615 (S.D.N.Y. 1991) ("The informant's continuing cooperation with the government and knowledge of the recording is tantamount to his consent to record [the] conversations . . . .").  The Court finds that CD1 consented to the interception, and thus DENIES this Motion (ECF No. 118).


### III.   CONCLUSION

For the foregoing reasons, the Court DENIES the just-discussed Motions to Suppress (ECF Nos. 107, 108, 109, 116, and 118).  The Court RESERVES RULING on Defendant's Motion to Suppress Testimony Regarding Out-Of-Court and In-Court Identifications (ECF No. 117) and will rule if and when the Government calls the identification witnesses at trial.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 26th day of July, 2017.