UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:16-cr-20-GZS |
| CAREY ACKIES, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION TO SUPPRESS TESTIMONY REGARDING OUT-OF-COURT AND IN-COURT IDENTIFICATIONS

Defendant Carey Ackies has moved to suppress out-of-court identifications of him made by two cooperating witnesses, as well as any in-court identifications that would be made by these witnesses at trial (ECF No. 117). The Court held an evidentiary hearing regarding several motions to suppress by Defendant on June 29th and 30th, 2017, at which time the Court informed the parties that it intended to defer ruling on Defendant's Motion. At a conference of counsel in preparation for trial held on November 16, 2017, the parties consented to the Court deciding the Motion in advance of trial based on the parties' briefs and the evidence taken at the suppression hearing. After reviewing the undisputed facts in Defendant's Motion and the Government's Response (ECF No. 122), as well as the suppression hearing evidence, the Court DENIES Defendant's Motion.

### I. FACTUAL BACKGROUND

During the investigation leading to Defendant's arrest, law enforcement received information from cooperating defendant #1 ("CD #1"), a suspected drug trafficker in Maine. CD #1 told law enforcement that he had previously purchased substantial quantities of drugs on multiple occasions from a black male drug connection in New York that CD #1 knew as "Boyd."

CD #1 also told law enforcement that he had traveled to New York about a month prior and had met with Boyd at a motel in the New York City area. CD #1 represented that he had also met with Boyd in New York on at least one previous occasion and provided details about several vehicles that he had seen Boyd driving.[1]

Based on phone calls and text messages between CD #1 and Boyd that appeared to discuss the details of a drug delivery from Boyd to CD #1, law enforcement intercepted "Mike," a suspected drug runner for Boyd, at a bus station in Portland, Maine. Law enforcement found a package of drugs on the man and arrested him. He decided to cooperate and is hereinafter referred to as cooperating defendant #2 ("CD #2"). In an interview with law enforcement following his arrest, CD #2 said that he had picked up the drugs from "the main guy," a man he knew as "Boy,"[2] "Killer," or "KO," at Boy's apartment in New York City less than twenty-four hours earlier; provided details of the building that matched the details of Defendant's suspected residence; described visiting Boy's apartment previously and accurately described details of its contents; accurately described aspects of Defendant's family and living arrangements; accurately described a vehicle associated with Defendant; and reported that he had met Boy through his wife or fiancée, who bears some type of close familial relation to Boy. Later that same day, CD #2 also recalled Boy's real name as being "Curry" or "Carey."

After law enforcement identified Defendant as a suspect, a drug taskforce officer showed CD #1 a single photograph of Defendant, a booking photograph from a prior criminal proceeding. CD #1 said that he was not certain that the person in the photograph was Boyd because the person

---

[1] CD #1 and Boyd also had extensive dealings by phone and text message that were monitored and recorded by law enforcement with the consent of CD #1. These contacts are not directly relevant to the identification issue, for obvious reasons.

[2] As the Court has previously noted, it is not entirely clear whether "Boy" is an additional alias or simply a misunderstanding or mishearing of "Boyd."

in the photograph looked "meaner." CD #2 was shown the same photograph and positively identified Defendant as Boy, the person who had given him the drugs to take to Maine. CD #1 was later shown a photograph of Defendant being arrested in this matter and positively identified Defendant as Boyd. At some later point, however, the Court understands that CD #1 may have told law enforcement that he did not believe the person in the photograph was in fact Boyd. CD #2 also subsequently told law enforcement that he did not recognize the photograph he had seen of Defendant and no longer wished to cooperate.

## II. ANALYSIS

The Court must determine whether the out-of-court identifications present a very substantial likelihood of irreparable misidentification. Courts use a "two-step analysis when considering whether a pretrial identification procedure raises a very substantial likelihood of irreparable misidentification: [a court] first determine[s] whether the identification procedure was impermissibly suggestive, and if it was, [the court] then look[s] to the totality of the circumstances to decide whether the identification was still reliable." United States v. DeCologero, 530 F.3d 36, 62 (1st Cir. 2008) (quotation marks omitted). At the second step of the analysis, a court must consider "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation." United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)). In general, "[a] court should exclude an out-of-court identification based on a photo array only in those extraordinary cases where there is a very substantial likelihood of irreparable misidentification." DeCologero, 530 F.3d at 61

(quotation marks omitted). Outside the extraordinary case, "such evidence is for the jury to weigh . . . Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Id. (quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977)).

Assuming for purposes of deciding this motion that the single-photo identification procedures at issue were impermissibly suggestive, the Court concludes that, considering the totality of the circumstances in light of the Biggers factors, the out-of-court identifications of Defendant are still sufficiently reliable that there is no substantial likelihood of irreparable misidentification. Specifically, both cooperating witnesses represented that they had met multiple times with the man they identified in situations which would have afforded them ample opportunity to closely observe him. In addition to the drug conspiracy connection, CD #2 also reported having some sort of familial relationship with the man he identified. Both witnesses had seen the man they identified relatively recently. Finally, both witnesses' accounts of familiarity with the man they identified were corroborated by accurate information they provided concerning Defendant's legal name, familial living arrangements, apartment, and vehicles. In short, the identifications did not arise from the type of "fleeting encounter" that might provide an inadequate basis for reliable identification testimony. See United States v. García, 452 F.3d 36, 42 (1st Cir. 2006) (contrasting hypothetical identification testimony based on a "fleeting encounter" with admissible identification testimony based on a meeting during which the witness likely had an opportunity to "fully observe" the defendant). The fact that CD #1 was initially uncertain in identifying Defendant is not dispositive because "not all the *Biggers* factors must point in one direction for an identification to be upheld." DeCologero, 530 F.3d at 63.

The Court recognizes that there are several elements that could undermine the weight or credibility of any identification testimony by CD #1 or CD #2.³ However, the Court is confident that a jury will be able to properly weigh and assess the accuracy and credibility of the out-of-court identifications. See Henderson, 320 F.3d at 101-02 (noting, in determining that identification testimony was properly submitted to the jury, that factors undercutting the credibility of the identification testimony were before the jury for it to consider); see also United States v. Melvin, 730 F.3d 29, 34 (1st Cir. 2013) (opining, in discussing admissibility of identification evidence, that "[j]urors should not be treated as gullible dupes"). Finally, because the Court determines that the out-of-court identifications by CD #1 and CD #2 are sufficiently reliable, there is no question of "taint" and any in-court identification of Defendant by these witnesses is also admissible if a proper foundation is otherwise laid. See Simmons v. United States, 390 U.S. 377, 383-84 (1968) (explaining that an in-court identification may be tainted by an earlier, improper, out-of-court identification).

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion (ECF No. 117) is DENIED. This denial, however, is WITHOUT PREJUDICE to Defendant moving to exclude the challenged identification evidence at trial to the extent this evidence is presented.

SO ORDERED.

                                            /s/ George Z. Singal
                                            United States District Judge

Dated this 20th day of November, 2017.

---

³ For example, the Court notes that in initially describing "Boy" as a slim, black male with short hair, CD #2 did not mention facial hair. The photo of Defendant's arrest less than a week after CD #2 last saw Boy appears to show Defendant with facial hair. (See Supp. Hr'g Gov't Ex. 15.) This is certainly something the jury could consider but does not outweigh the other indicia of reliability relating to CD #2's out-of-court identification.